UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRYSTAL L. PENA,

                    Plaintiff,            Civil Action No. 19-10670
                                          Honorable Terrence G. Berg
v.                                        Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 16]

Plaintiff Krystal Pena ("Pena") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #14, #16), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.    RECOMMENDATION

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that Pena is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment (**Doc. #16**) be **DENIED**, Pena's Motion for Summary Judgment (**Doc. #14**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to

the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. §
405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this
Report and Recommendation.

## II.    REPORT

### A.    Background

Pena was 22 years old at the time of her alleged onset date of September 28, 2015,
and at 5'4" tall weighed between 285 and 345 pounds during the relevant time period.  (Tr.
39, 207, 212).  She completed high school but had no further education.  (Tr. 213).  She
worked as a cashier at McDonald's on a part-time basis for a few months but stopped
working in July 2015 because of her conditions.  (Tr. 42-43, 213).  She now alleges
disability primarily as a result of back pain, migraines, anxiety, and post-traumatic stress
disorder ("PTSD").  (Tr. 212).

After Pena's applications for DIB and SSI were denied at the initial level on March
24, 2016 (Tr. 103-06, 111-14), she timely requested an administrative hearing, which was
held on March 5, 2018, before ALJ JoErin O'Leary (Tr. 34-76).  Pena, who was represented
by attorney Lewis Seward, testified at the hearing, as did Pena's mother (Tamara Phillip),
case manager (Laurel McClure), and the vocational expert (Adolf Cwik).  (*Id.*).  On June
12, 2018, the ALJ issued a written decision finding that Pena is not disabled under the Act.
(Tr. 15-26).  On January 22, 2019, the Appeals Council denied review.  (Tr. 1-5).  Pena
timely filed for judicial review of the final decision on March 6, 2019.  (Doc. #1).

The Court has thoroughly reviewed the transcript in this matter, including Pena's
medical record, function and disability reports, and testimony as to her conditions and

2

resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

**B.     The ALJ's Application of the Disability Framework Analysis**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the

> claimant can perform, in view of his or her age, education, and work
> experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich.

Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first

four steps …. If the analysis reaches the fifth step without a finding that claimant is not

disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human

Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Pena is not disabled

under the Act. At Step One, the ALJ found that Pena has not engaged in substantial gainful

activity since September 28, 2015 (the alleged onset date). (Tr. 17). At Step Two, the ALJ

found that she has the severe impairments of degenerative disc disease; pseudotumor

cerebri with headaches; obstructive sleep apnea; obesity; PTSD; major depressive disorder;

and generalized anxiety disorder. (*Id.*). At Step Three, the ALJ found that Pena's

impairments, whether considered alone or in combination, do not meet or medically equal

a listed impairment. (Tr. 18).

The ALJ then assessed Pena's RFC, concluding that she is capable of performing

light work, with the following additional limitations: standing and walking are limited to

four hours in an eight-hour workday; can occasionally climb ramps and stairs, balance,

stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; can never be

exposed to unprotected heights or dangerous moving mechanical parts; can understand

simple instructions not requiring a specific production rate; can make simple work-related

4

decisions; can occasionally deal with supervisors and coworkers; and can never be required to deal with the general public.  (Tr. 20).

At Step Four, the ALJ found that Pena has no past relevant work.  (Tr. 24).  At Step Five, the ALJ determined, based in part on testimony provided by the vocational expert in response to hypothetical questions, that Pena is capable of performing the jobs of electrical accessories assembler (21,000 jobs nationally), hammermill/pulverizer (60,000 jobs), and inspector/hand packager (48,600 jobs).  (Tr. 25).  As a result, the ALJ concluded that Pena is not disabled under the Act.  (Tr. 26).

### C.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

## D.   Analysis

In her motion, Pena argues that the ALJ erred in evaluating the opinions of her treating psychiatrist, Manuel Dumlao, M.D., and her treating therapist, Judy McAtee, LMSW, CMW.[1] (Doc. #14 at 8-19). More specifically, Pena argues that the reasons articulated by the ALJ for discounting these opinions are not supported by substantial evidence.[2] (*Id.*). For the reasons set forth below, the Court finds merit to Pena's arguments.

---

[1] Because Pena's arguments before this Court focus on the ALJ's evaluation of her mental impairments, the Court will confine its discussion to evidence pertaining to these conditions.

[2] Pena also argues that the ALJ erred in evaluating these two opinions "in the same one-sentence analysis." (Doc. #14 at 9). The Commissioner sees no harm, arguing that the opinions are

### 1.     The Relevant Medical Evidence

By way of background, some five years before her alleged onset date in September 2015, Pena was a passenger in a car accident that killed her then-boyfriend.  (Tr. 292). Two years later, Pena was still suffering from severe PTSD, generalized anxiety disorder, and major depressive disorder, and was unable to drive or leave the house, spending all her time isolating herself in her bedroom.  (Tr. 292-93).

On March 9, 2016, Pena underwent a consultative psychological examination with George Pestrue, Ph.D.  (Tr. 387-92).  Pena reported that she and her husband both lived with her parents, and she described suffering from daily anxiety attacks, as well as flashbacks to the car accident in which her boyfriend had been killed.  (Tr. 387, 389).  Dr. Pestrue performed a mental status examination and opined that Pena's "panic attacks will make it difficult for her to work in stressful settings"; her depression "leaves her tired and lacking in motivation"; and her "migraines and other medical issues will make it difficult for her to maintain most jobs."  (Tr. 392).

On August 5, 2016, Pena presented to Dr. Dumlao at Bay Arenac Behavioral Health for treatment of her "severe anxiety, associated fears and depression."  (Tr. 437).  Dr. Dumlao noted that Pena has a high basal level of anxiety, and her "anxiety worsens nightly and she expresses various fears that she may be hurt or killed or be harmed in some way

---

"substantively identical," and – if anything – the ALJ "went beyond the regulatory requirements" when she evaluated Ms. McAtee's opinion as that of an "acceptable medical source," rather than an "other source," within the meaning of the regulations.  (Doc. #16 at 8, 10).  While the ALJ should have evaluated each opinion on its own merits, the bigger problem is that the reasons articulated by the ALJ for discounting the two opinions are not supported by substantial evidence, as described more fully herein.

repetitively throughout the night." (*Id.*). Pena acknowledged having minimal interest in doing anything, poor energy, and frequent crying spells, and said that she stays home most days. (*Id.*). Dr. Dumlao prescribed Lexapro and Klonopin "to decrease and cap her severe anxiety, assorted fears including fear of dying that is extreme most evenings." (Tr. 440). At a follow-up visit on September 23, 2016, Pena reported that she could not tolerate Lexapro and that she had not started Prozac, as she had apparently been directed to do. (Tr. 436). She also was "barely" taking Klonopin at night, and not at all during the day, despite high anxiety, expressing an ongoing fear of taking medications and their potential side effects. (*Id.*). Over the next few months, Pena reported being unable to tolerate 10 mg of Prozac, as prescribed, saying she was taking only 5 mg daily. (Tr. 426, 429). Genotyping was ordered, as Pena reported having been unable to tolerate other antidepressants – including Effexor, Zoloft, Lexapro, and Abilify – in the past. (Tr. 428).

At her next visit to Dr. Dumlao, in February 2017, he diagnosed Pena with obsessive-compulsive disorder ("OCD"), along with major depressive disorder, PTSD, and an unspecified anxiety disorder, and observed:

> Krystal is not doing well. Her compulsive checking rituals are frequent and she now takes a picture of a door lock to allow her to check at a later date. Her anxiety is high and her mood is not as problematic. We discussed her genotyping results and unfortunately most serotonergic drugs are in moderate and severe risk categories for drug side effects due to the poorly metabolizing pattern of her genotype. I discussed a cautious trial with extensive discussion of potential side effects. I will continue [Klonopin] for now.

(Tr. 424-25). At a medication review on April 21, 2017, Dr. Dumlao noted that Pena was "feeling much better," although she continued to experience panic attacks in unfamiliar

places and still had anxiety/panic attacks every evening prior to bedtime.  (Tr. 418).  She

was tolerating clomipramine, and her dose was increased from 25 mg to 50 mg.  (Tr. 420).

At an August 25, 2017 follow-up visit, however, Dr. Dumlao noted that Pena could

not tolerate the increased dose of clomipramine, so she discontinued it and experienced an

increase in anxiety attacks and irritability.  (Tr. 545).  Dr. Dumlao discussed Pena's past

medications, their side effects, and the "fact that she was not able to tolerate any at desired

dosages."  (*Id.*).  Pena reported being able to walk her dog up to a half mile round trip, but

her sleep was still disturbed, and she continued to do "compulsive checking of the faucet,

door locks, dog kennel lock and stove controls."  (*Id.*).  Pena asked to try a low dose of

clomipramine again, along with clonazepam, and Dr. Dumlao agreed with this approach.

(Tr. 548).  On November 17, 2017, however, Dr. Dumlao noted that:

> Krystal is not doing well.  She could not tolerate activation symptoms
> from clomipramine.  She ended up in an ER[3] due to acute and severe
> anxiety.  She is also losing weight too rapidly at times ending up with
> acute dehydration and hypokalemia on one or 2 occasions.  She is
> unwilling to take any other medications at this time.  She is willing to
> try to increase clonazepam but she is taking tiny amounts of this drug,
> a quarter of a 0.5 mg tablet daily.  After discussion, she agreed to
> increase clonazepam from half to 1 tablet [three times a day].
>
> Her mother requested psychotherapy and I agreed it may be quite
> helpful.  They also requested a note to allow her to have an Emotional
> Support Animal (dog) with her ….  I gave her a prescription for this
> request.

---

[3] Specifically, on October 28, 2017, Pena presented to the emergency room via EMS, complaining
of increased anxiety and believing she suffered an allergic reaction after she took the first dose of
a new anxiety/OCD medication that day.  (Tr. 680).  In November and December 2017, she also
presented to the emergency room on multiple occasions with complaints of abdominal pain,
shortness of breath, a fast heartrate, and weakness; each time, her anxiety was noted, but no
physical abnormalities were found.  (*E.g.*, Tr. 641, 658, 672, 807, 809, 1029, 1041).

(Tr. 544 (footnote added)).  On December 22, 2017, Dr. Dumlao observed:

> Krystal has not been doing well.  Her anxiety has been very high since her last visit.   Anxiety worsens in the evening as evidenced by increased shortness of breath.  She feels most comforted when she has her CPAP on.  She verbalized to her mother that she had forgotten how to breathe such that she has to make a noise when breathing to assure her she is in fact breathing.  She has gone to Emergency 4 times the past 6 weeks.   She was [on] IV fluids for dehydration, hypoglycemia and advised she is healthy physically.   When in buildings even in emergency rooms, she feels compelled to exit the exact route she came in.  If she does not, she fears she may exit into another world or other poor outcome.

(Tr. 797).  On mental status examination, she was "highly anxious" with a tense and restricted affect, and Dr. Dumlao noted that her compulsions had worsened.  (Tr. 797, 800).  Pena agreed to try a higher dose of clonazepam, re-start Zoloft, and see a psychotherapist more often to help her cope with her "severe anxiety."  (Tr. 800).[4]

On December 29, 2017, Dr. Dumlao completed a Mental Impairment Questionnaire, indicating that Pena's diagnoses included OCD, major depression, and PTSD.  (Tr. 973).  When asked to identify Pena's signs and symptoms, Dr. Dumlao checked boxes for: appetite disturbance with weight change; mood disturbance; recurrent panic attacks;

---

[4] During this same general timeframe, Pena also was receiving case management services from Laurel McClure at Bay Arenac Behavioral Health.  (Tr. 1067-1109).  On August 2, 2017, Ms. McClure noted that Pena continued to have "extreme difficulty" going out in public, preferring to stay home and only going out with her mother for brief shopping trips.  (Tr. 1053).  Ms. McClure further noted that Pena's "extreme anxiety" made it "very unlikely she would be able to maintain employment."  (Tr. 1054).  On mental status examination, she had lethargic psychomotor activity, fearful and moderately inappropriate affect, mildly impaired memory, poor coping ability, and significant phobias.  (Tr. 1060-62).  Ms. McClure noted that Pena would benefit from – but was not eligible for – outpatient therapy services in the home.  (Tr. 1064, 1066).  On October 26, 2017, Ms. McClure noted that Pena reported medication adherence and a stable mood, but she was not getting out much due to anxiety and was still "quite dependent on her mother."  (Tr. 1043).  And, on December 7, 2017, Ms. McClure noted that Pena's anxiety was "very high" and her mother could not get her to leave the house.  (Tr. 1039).

difficulty thinking or concentrating; oddities of thought, perception, speech, or behavior; "severe" social withdrawal or isolation; decreased energy; obsessions or compulsions; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and pathological dependence or passivity. (*Id.*). He also noted that she has an extreme fear or apprehension of possible medication adverse effects with a history of increased sensitivity to medications. (*Id.*). Dr. Dumlao further opined that Pena has a continuous and marked limitation in the ability to deal with ordinary work stress; would be off-task three or more hours in a work day as a result of severe emotional problems; and would miss work more than three times a month as a result of her impairments. (Tr. 974).

Finally, Dr. Dumlao opined that Pena is markedly limited in numerous work-related areas, including the abilities to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek and perform at a consistent pace; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. 975-76).

It also appears that Pena treated with therapist Judy McAtee briefly in 2013, and

11

then again in 2017 and 2018.   Although Ms. McAtee's treatment notes are difficult to

decipher (Tr. 978-81), she completed a Mental Impairment Questionnaire on February 23,

2018, indicating that Pena's diagnoses included OCD and anxiety/panic disorder (Tr. 1112-

15).   When asked to identify Pena's signs and symptoms, Ms. McAtee checked boxes for:

mood disturbance; recurrent panic attacks; oddities of thought, perception, speech, or

behavior; social withdrawal or isolation; decreased energy; obsessions or compulsions;

persistent irrational fears; generalized persistent anxiety (with panic attacks); and

pathological dependence or passivity.  (Tr. 1112).  She also noted that Pena has child-like

speech and only a modestly endowed intellectual capacity.  (*Id.*).  Ms. McAtee further

opined that Pena has a marked limitation in the ability to deal with ordinary work stress;

would be off-task three or more hours in a work day as a result of severe emotional

problems; and would miss work more than three times a month as a result of her

impairments.  (Tr. 1113).  Finally, McAtee opined that Pena is markedly limited in several

work-related areas, including the abilities to perform activities within a schedule, maintain

regular attendance, and be punctual within customary tolerances; complete a normal

workday and workweek and perform at a consistent pace; maintain socially appropriate

behavior and adhere to basic standards of neatness and cleanliness; travel in unfamiliar

places or use public transportation; and set realistic goals or make plans independently of

others.  (Tr. 975-76).

> ### 2.      *The ALJ's Evaluation of Dr. Dumlao's and Ms. McAtee's Opinions*

Pena now argues that the ALJ erred in discounting the December 2017 and February

2018 opinions of Dr. Dumlao and Ms. McAtee.  (Doc. #14 at 8-19).  The treating physician

rule "mandate[s] that the ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)). "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(c)(2)). As a rule, then, the ALJ must build an accurate and logical bridge between the evidence and his conclusion. *See Wilson*, 378 F.3d at 544-46 (ALJ's failure to make sufficiently clear why he rejected the treating physician's opinion was not harmless error, even if substantial evidence not mentioned by the ALJ may have existed to support the ultimate decision to reject the treating physician's opinion).

In this case, the ALJ considered the Mental Impairment Questionnaires completed by Dr. Dumlao and Ms. McAtee in a single paragraph, stating as follows:

> The undersigned assigns only limited weight to the opinions of Manuel Dumlao, MD, the claimant's psychiatrist, and Judy McAtee, LMSW, the claimant's therapist, who opined that the claimant would be capable of simple, one- to two-step tasks with moderate to marked limitations in the areas of sustained concentration and persistence,

13

social interaction, and adaption. Dr. Dumlao and Ms. McAtee also
opined that the claimant would be off-task more than three hours in
an eight hour workday and miss more than three days of work in a
month. That the claimant is limited to simple tasks is supported by
her often anxious and/or depressed mood, while marked limitations in
any area and attendance difficulties are not consistent with her
otherwise largely normal mental status examinations and good
response to her conservative medication regimen when she is
compliant with treatment.

(Tr. 24 (internal citations omitted)). Pena now argues that the reasons articulated by the
ALJ for discounting these opinions are not supported by substantial evidence.

Pena first takes issue with the ALJ's decision to discount these opinions as
purportedly inconsistent with her "largely normal mental status examinations." (Doc. #14
at 14 (quoting Tr. 24)). To begin with, as Pena notes, the ALJ does not cite to any specific
treatment notes or medical records in reaching this conclusion, nor does she explain how
or why such evidence purportedly is inconsistent with the opinions of Dr. Dumlao and Ms.
McAtee. This is insufficient, as it is not this Court's function to comb through the record
to determine what evidence the ALJ may have had in mind to support her conclusion. *See
Mendyk v. Comm'r of Soc. Sec.*, No. 18-11730, 2019 WL 4053949, at *6 (E.D. Mich. Aug.
7, 2019) ("neither the claimant nor the Court can be expected to search through the record
and guess about what appeared to be 'inconsistent' in the ALJ's mind's eye").

The Commissioner urges the Court to overlook the ALJ's failure to cite to specific
evidence and, instead, to consider the decision "as a whole." (Doc. #16 at 14). Even if the
Court were to do so, however, its conclusion would not change. As Pena points out, the
ALJ used a nearly-identical phrase elsewhere in her decision, observing that although Pena
"did present with anxious and/or depressed mood at many examinations [she] had

14

*otherwise normal mental status examination[s] throughout the relevant period.*"  (Tr. 22 (emphasis added)).  In support of that observation, the ALJ cited to three medical records – Exhibit 11F, Exhibit 21F/30, and Exhibit 31F – none of which constitutes substantial evidence in support of the ALJ's finding.  For example, Exhibit 11F is a report from the consultative *physical* examiner, who was charged with evaluating Pena's back pain, neck pain, and pseudotumor celebri, and who merely noted in passing that her mental status – on that one occasion (in March 2016) – appeared "normal."  (Tr. 394-400).  Similarly, "Exhibit 21F/30" contains a check-box assessment of Pena's mood and orientation conducted during an emergency room visit, when she presented with generalized weakness and hypokalemia due to dehydration.  (Tr. 660).  And, Exhibit 31F – which is the treatment notes from Ms. McAtee – document mental status examinations that hardly reflect "normal" findings.  (Tr. 978-81).  Indeed, all of Ms. McAtee's notes document an anxious and/or depressed mood, and other abnormal findings include comments about rapid breathing, panic attacks, child-like verbalization, and thinking that was variously characterized as "simplistic, guarded, tangential, child-like" and "childishly defensive, tangential, catastrophizing."  (*Id.*).  In short, the ALJ's citation to the foregoing records as evidence that Pena's mental status examinations were "largely normal" during the relevant time period is not compelling.

Moreover, looking beyond the three exhibits cited by the ALJ, a comprehensive review of the relevant medical evidence undercuts the ALJ's decision to discount the opinions of Dr. Dumlao and Ms. McAtee as inconsistent with Pena's "largely normal mental status examinations[.]"  (Tr. 24).  For example, although the consultative

15

psychological examiner, Dr. Pestrue, noted some normal findings – such as fair insight, adequate contact with reality, and spontaneous stream of mental activity – he specifically opined that Pena's "panic attacks will make it difficult for her to work in stressful settings"; her depression "leaves her tired and lacking in motivation"; and her "migraines and other medical issues will make it difficult for her to maintain most jobs." (Tr. 388-89, 392). In 2016 and 2017, Dr. Dumlao routinely described certain aspects of Pena's mental status in much the same way; although Dr. Dumlao found Pena's thoughts were goal directed and organized, her recent and remote memory was good, and her insight and judgment were good, the doctor also found that Pena presented with an affect that was tense, restricted, and/or anxious, she was "highly anxious", she had "paucity of speech", and she looked to her mother often to repeat or to answer the question asked. (Tr. 418, 422, 426, 429, 433, 439, 541, 545, 797). Dr. Dumlao also made the following, more specific observations, many of which were not mentioned by the ALJ: "severe generalized anxiety, panic attacks"; "[s]evere depression"; "expresses various fears that she may be hurt or killed or be harmed in some way repetitively throughout the night"; poor energy; frequent crying spells; stays home most days; and "much anxiety/fear of suffering from side effects of medications"; "always has anxiety/panic attacks every evening prior to bedtime"; "compulsive checking rituals are frequent"; despite being married, she sleeps next to her mother because of her fear of dying; and continues to do "compulsive checking of the faucet, door locks, dog kennel lock and stove controls."[5] (Tr. 418, 422, 433, 436, 437, 440,

---

[5] During this same time period, Pena's case manager, Laurel McClure, noted that Pena continued to have "extreme difficulty" going out in public; her "extreme anxiety" made it "very unlikely she

16

541, 545, 747).

The foregoing makes clear that the ALJ's characterization of Pena's mental status examinations as "largely normal" (Tr. 24) is simply not supported by substantial evidence, and is not the product of an even and thorough weighing of the competing evidence in the record.  *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)); *Roberts v. Colvin*, No. 13-14675, 2015 WL 181658, at *10 (E.D. Mich. Jan. 14, 2015) (noting that while ALJ need not discuss all record evidence, "the quality and volume of evidence not discussed by the ALJ may 'raise[ ] serious doubts about the supportability of the ALJ's RFC finding' and overall conclusions.") (quoting *Wilcox v. Comm'r of Soc. Sec.*, No. 13-12549, 2014 WL 4109921, at *7 (E.D. Mich. Aug.19, 2014)).

Other aspects of the ALJ's handling of the medical opinions are also problematic. The ALJ discounted key aspects of the opinions of Dr. Dumlao and Ms. McAtee – namely, that she was markedly limited in the areas of sustained concentration and persistence, social interaction, and adaption, as well as in the ability to maintain consistent attendance – as inconsistent with Pena's "good response to her conservative medication regimen when she

---

would be able to maintain employment"; and, on mental status examination, Pena had lethargic psychomotor activity, fearful and moderately inappropriate affect, mildly impaired memory, poor coping ability, and significant phobias.  (Tr. 1053, 1054, 1060-62).

17

is compliant with treatment."[6]  (*Id.*).  Again, however, the ALJ does not cite to any specific

evidence supporting this conclusion, and, indeed, a review of the evidence of record

suggests that Pena's response to the medications she has been prescribed is anything but

"good."  The record reflects that Pena has been treated for her mental impairments with no

less than thirteen different psychiatric medications, including Lexapro, clomipramine,

Klonopin, Prozac, buspirone, Celexa, Rozerem, Pristiq, Abilify, Effexor, Neurontin,

Ativan, and Zoloft.  There are numerous indications in the record of side effects from these

medications, as well as Pena's ongoing and overwhelming fear of the same.  (*E.g.*, Tr. 426

(unable to tolerate Prozac at 10 mg); Tr. 437 (noting that Pena had been prescribed several

antidepressants in the past; Effexor "made her sick" and buspirone worsened her migraine

headaches); Tr. 436 ("could not tolerate Lexapro" and "has much anxiety/fear of suffering

from side effects of medications"); Tr. 541 ("Krystal was not able to tolerate clomipramine.

She took one dose and suffered activation of acute anxiety.")).  Indeed, Dr. Dumlao ordered

enzyme genotyping, noting that Pena might be "excessively sensitive to medications," and

the results showed that she is at moderate to severe risk of drug side effects from most

serotonergic drugs due to the poor metabolizing pattern of her genotype.  (Tr. 424-25, 428).

Even after that testing was done, and Dr. Dumlao proceeded cautiously, Pena continued to

---

[6] The ALJ's phrasing in this respect suggests that she is discounting Pena's allegations, at least in part, because of her purported lack of compliance with treatment.  Social Security Ruling ("SSR") 16-3p provides, however, that an ALJ must not draw inferences from a claimant's failure to follow prescribed treatment without considering any explanations the claimant might provide.  *See SSR 16-3p*, 2016 WL 1119029, at *8-9 (Mar. 16, 2016).  Here, there is evidence that the side effects of Pena's prescribed medications were "less tolerable than the symptoms[,]" a fact that should have been considered by the ALJ before drawing an adverse inference against Pena.  *Id.*

experience difficulty tolerating medications and dosages.  (Tr. 544, 545 (unable to tolerate increased dose of clomipramine); Tr. 797 (expressing desire to re-try Zoloft, despite the fact that it caused "excessive sweats" in the past); Tr. 973 (Dr. Dumlao's opinion that Pena has an extreme fear or apprehension of possible medication adverse effects with a history of increased sensitivity to medications)).[7]  Thus, the record simply does not support the ALJ's summary conclusion – without citation to evidence – that Pena has had a "good response to her conservative medication regimen."  *See Trudell*, 130 F. Supp. 2d at 895.

In summary, Pena witnessed the traumatic death of her boyfriend when she was just 17 years old.  Since that time, her anxiety has – if anything – increased, to the point where she rarely leaves her home (and then only with her mother).  Despite the fact that she is married, she sleeps next to her mother – not her husband – because she is terrified she will stop breathing and her mother will need to perform CPR.  She has taken more than a dozen different psychiatric medications over the years without significant relief of her symptoms and is now so worried about the side effects of these medications that she cannot tolerate dosages sufficient to treat her OCD, PTSD, or anxiety.  Her treating physician, trauma therapist, and case worker all agree that she cannot sustain a job on an ongoing basis.  Given these facts, the Court simply cannot find that substantial evidence supports the ALJ's

---

[7] At the administrative hearing, Pena testified in greater detail regarding her excessive worry about medication side effects (and other medical procedures).  (Tr. 43 (declined a spinal tap – the definitive test to diagnose her pseudotumor cerebri – because she doesn't "want anything near [her] spine" and doesn't "want to be paralyzed"); Tr. 45, 50 (does not want an injection for back pain because she doesn't "like shots, because [she] could have an allergic reaction to the medication or be paralyzed"); Tr. 50 (doesn't like taking any new medications because she is "scared of having an allergic reaction")).

decision to discount the opinions of Pena's treating mental health providers as inconsistent with her "largely normal mental status examinations and good response to her conservative medication regimen[.]" (Tr. 24). As such, remand is required so that the ALJ can properly consider the medical opinions in question.

## III.    CONCLUSION

For foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(Doc. #16)** be **DENIED**, Pena's Motion for Summary Judgment **(Doc. #14)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: November 20, 2019                         s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation, any party may serve and file specific written objections to the proposed findings and recommendations set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. L.R. 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some

objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. L.R. 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 20, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager